*Mch 4/19/2022*



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

*Christina A. Hoffman*
*Assistant United States Attorney*
*Christina.hoffman @usdoj.gov*

*36 South Charles Street*
*Suite 400*
*Baltimore, MD 21201-3119*

*DIRECT: 410-209-4871*
*MAIN: 410-209-4800*
*FAX: 410-962-0716*

USDC- BALTIMORE
'22 JUN 3 PM12:50

April 19, 2022

**BY EMAIL**

John McKenna, Esq.
Brennan McKenna & Lawlor, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770
Tel: (301) 474-0044
Email: jmckenna@brennanmckenna.com

Re: *United States v. Ridgley Shipley*, Criminal No. CCB-19-0568

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (the "Agreement") that has been offered to your client, Ridgley Shipley, a/k/a "Crazy" (hereinafter the "Defendant"), by the United States Attorney's Office for the District of Maryland (the "Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **April 29, 2022**, it will be deemed withdrawn. The terms of the Agreement are as follows:

**Offenses of Conviction**

1.    The Defendant agrees to plead guilty to Counts One and Nine of the Superseding Indictment charging the Defendant with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). The Defendant admits that the Defendant is, in fact, guilty of the offenses, and will so advise the Court.

**Elements of the Offenses**

2.    The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows.

Count One: Racketeering Conspiracy, 18 U.S.C. § 1962(d)

That from in or about 2008 continuing until on or about the date of the Superseding Indictment, in the District of Maryland,

Rev. August 2018

a. an enterprise existed as alleged in the Superseding Indictment;

b. the enterprise affected interstate or foreign commerce;

c. the Defendant was associated with or employed by the enterprise; and

d. the Defendant knowingly and willfully conspired with one or more persons to conduct and participate in the affairs of the enterprise through a pattern of racketeering activity.

Count Nine: Using, Carrying, and Brandishing a Firearm During and in Relation to a Crime of Violence, 18 U.S.C. § 924(c)

That on or about the date alleged in the Superseding Indictment, in the District of Maryland,

a. the Defendant committed a crime of violence for which he might be prosecuted in a Court of the United States, specifically, Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a); and

b. the Defendant knowingly used, carried, and brandished a firearm during and in relation to the commission of that crime.

## Penalties

3. The maximum penalties provided by statute for each offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Min. Prison | Max. Prison | Supervised Release | Max. Fine | Special Assessment |
|-------|---------|-------------|-------------|--------------------|-----------|--------------------|
| One | 18 U.S.C. § 1962(d) | N/A | 20 years | Max: 3 years | \$250,000 | \$100 |
| Nine | 18 U.S.C. § 924(c) | 7 years consecutive to any other term of imprisonment | Life | Max: 5 years | \$250,000 | \$100 |

a. *Prison*: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b. *Supervised Release*: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

Rev. August 2018

c.      *Restitution*: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      *Payment*: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

e.      *Forfeiture*: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      *Collection of Debts*: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (i) the full amount of the fine or restitution is nonetheless due and owing immediately; (ii) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (iii) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

## Waiver of Rights

4.      The Defendant understands that, by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to

Rev. August 2018

3

RS

present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.      If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" provisions below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced case, and the Court will find the Defendant guilty.

h.      By pleading guilty, the Defendant also will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that, if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Parties stipulate and agree pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure that the sentence outlined in paragraph 9 is an appropriate disposition of the case. The Defendant understands that the Court will determine a sentencing guidelines range

Rev. August 2018

4

RS

for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991–98. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.     This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

a.     The parties agree and stipulate that pursuant to U.S.S.G. § 2E1.1(a)(2), the offense level for racketeering conspiracy is the greater of offense level 19 or the offense level applicable to the underlying racketeering activity.  Pursuant to U.S.S.G. § 1B1.3, the underlying racketeering activities in this case involve acts, committed, aided, abetted, counseled, commanded, induced, or willfully caused by the Defendant, as well as all those acts reasonably foreseeable to him in furtherance of the jointly undertaken criminal enterprise, and include, among others:

> i.     Conspiracy to distribute and possess with the intent to distribute heroin and cocaine base, in violation of 21 U.S.C. § 846,
>
> ii.    Distribution and possession with intent to distribute heroin and cocaine base, in violation of 21 U.S.C. § 841, and
>
> iii.   Robbery, chargeable under Md. Code Ann., Crim. Law § 3-402 and 3-403 (Maryland Robbery), and the Common Law of Maryland, and punishable pursuant to Md. Code Ann. Crim. Law §§ 1-201, 1-202, 3-402, and 3-403.

b.     With respect to the conspiracy to distribute and distribution and possession with intent to distribute heroin and cocaine base, the base offense level is **26** pursuant to U.S.S.G. § 2D1.1(c)(8) because the offense involved at least 400 grams but less than 700 grams of heroin. There is a **2-level enhancement** pursuant to U.S.S.G. § 2D1.1(b)(1) because a firearm was possessed.  There is an additional **2-level enhancement** pursuant to U.S.S.G. § 2D1.1(b)(2) because the defendant used, threatened to use, or made a credible threat to use violence.  The adjusted offense level is **30**.

c.     With respect to robbery, the base offense level is **20** pursuant to U.S.S.G. § 2B3.1.  There would ordinarily be a 6-level increase in the offense level because a firearm was used, but that adjustment is not applicable here because the Defendant is also pleading guilty to a violation of 18 U.S.C. § 924(c).  *See* U.S.S.G. § 2K2.4, App. Note 4.  The offense level is therefore **20**.

d.     Pursuant to the grouping rules of U.S.S.G. § 3D1.4(c), the combined offense level for the two groups (drug trafficking and robbery) remains at **30**.

Rev. August 2018

e.      This Office does not oppose a **2-level** reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional **1-level** decrease, in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. §3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offenses; (iii) gives conflicting statements about the Defendant's involvement in the offenses; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

f.      The anticipated total offense level for Count One is **27.**

g.      This Office and the Defendant further agree that with respect to Count Nine, the guideline sentence is 7 years consecutive to any other count of conviction. *See* U.S.S.G. § 2K2.4(b). Chapters 3 and 4 do not apply to this count of conviction. *Id.*

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

9.      The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a total sentence of **184 months in the custody of the Bureau of Prisons (that is, 100 months on Count One and 84 months consecutive on Count Nine), followed by 5 years of supervised release**, is the appropriate disposition of this case taking into consideration the nature and circumstances of the offense, the Defendant's criminal history, and all of the other factors set forth in 18 U.S.C. § 3553(a). This Agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this Agreement, except under the circumstances noted below, either party may elect to declare the Agreement null and void. Should the Defendant so elect, the Defendant will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the Defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the Government will be bound by the specific sentence contained in this Agreement, and the Defendant will not be able to withdraw his plea.

RS

## Obligations of the Parties

10. At the time of sentencing, this Office and the Defendant will recommend a total sentence of **184 months of imprisonment in the custody of the Bureau of Prisons, followed by 5 years of supervised release**. This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of any counts of the Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Forfeiture

11. The Defendant understands and agrees that, as a result of his guilty plea, he will not be permitted to own, possess, or use a firearm or ammunition.

12. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

13. The Defendant agrees to consent to the entry of such an Order of Forfeiture and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

14. The Defendant agrees to assist fully in the forfeiture of any such property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

## Defendant's Conduct Prior to Sentencing and Breach

16. Between now and the date of sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any

Rev. August 2018

7

statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

17.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (a) this Office will be free from its obligations under this Agreement; (b) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C); and (c) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Waiver of Appeal

18.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

b.     The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term or condition of supervised release, or order of forfeiture) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, or term or condition of supervised release), except as follows:

i.     The Defendant reserves the right to appeal any sentence that exceeds **184 months imprisonment**; and

ii.     This Office reserves the right to appeal any sentence below **184 months imprisonment**.

Rev. August 2018

8

19.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned case and agrees not to file any request for documents from this Office or any investigating agency.

## Court Not a Party

20.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. In the event the Court rejects this Rule 11(c)(1)(C) plea agreement, the Defendant will be informed that he may withdraw his plea pursuant to Rule 11(c)(5)(C). If he persists in the guilty plea thereafter, the Defendant understands that the disposition of the case may be less favorable than that contemplated by this agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

21.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Sincerely,

Erek L. Barron
United States Attorney

By:     *Christina Hoffman*

Christina A. Hoffman
Kim Y. Oldham
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have

reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

4/26/22
Date

Ridgley Shipley

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

4/26/22
Date

John McKenna, Esq.

Rev. August 2018

10

## ATTACHMENT A
## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Eight Tray Gangster Crips, or "ETG" Crips, were a violent subset of the Crips gang that operated on the streets and in correctional facilities in Maryland and elsewhere. For many years, the ETG Crips controlled the drug trade in particular territories in Baltimore City, Maryland, including the area around the intersection between West Baltimore Street and North Hilton Street in West Baltimore (the "Baltimore Hilton neighborhood"), the area around the intersection between West Lexington Street and North Fremont Avenue (the "Lexington Terrace neighborhood"), and the area around the intersection of Frankford Avenue and Sinclair Lane in North Baltimore (the "Frankford Sinclair neighborhood").

The ETG Crips originated in Los Angeles, California in the 1970s, and derived their name from 83rd Street, where they were formed. Within the ETG Crips, various cliques emerged corresponding to different neighborhoods in Los Angeles, such as the Baccwest ETG Crips in West Los Angeles and the Nutty North Side ETG Crips in North Los Angeles. Eventually, the ETG Crips spread throughout other states across the country, and they became prevalent in Maryland beginning in the 2000s. In Baltimore, the ETG Crips members from the Baltimore Hilton and Lexington Terrace neighborhoods referred to themselves as the Baccwest ETG Crips—modeling themselves after the Baccwest ETG Crips in Los Angeles. Similarly, ETG Crips members from the Frankford Sinclair neighborhood called themselves the Nutty North Side ETG Crips. ETG Crips members from different neighborhoods worked together cooperatively to engage in criminal activity and to avoid detection by law enforcement.

The ETG Crips were organized hierarchically, with members climbing the ranks from "BG" (Baby Gangster), to "YG" (Young Gangster), to "G" (Gangster), to "OG" (Original Gangster), to "OOG" (Original Original Gangster), and so on.

ETG Crips members were required to follow certain rules of conduct. Members who violated these rules or who disobeyed an order from a superior were subjected to disciplinary measures called "sanctions," which ranged from fines to murder. Violations that were punishable by murder included "snitching" (*i.e.*, cooperating with law enforcement); "homosexuality"; and murdering a fellow Crip without a "greenlight" (*i.e.*, authorization and approval from the gang leadership). Other ETG Crips rules included: "Never drop your flag," "Respect all rank," "Never discuss Tray business with nobody but Trays," and "Never let anyone disrespect the set." ETG

1

R S

Crips members enhanced their status within the gang by carrying out acts of violence against rivals and witnesses.

Prospective members of the ETG Crips were required to successfully complete an initiation process, which involved being sponsored by a senior member of the gang (referred to as a "Big Homie"), learning the history and rules of the gang, and reciting an oath of loyalty.

The ETG Crips operated street-level drug distribution "shops" in various locations in Baltimore City. These drug shops distributed heroin, cocaine, cocaine base (commonly known as "crack"), and marijuana, among other controlled substances. Non-members who attempted to sell drugs in the ETG Crips' territories were targeted for violence by ETG Crips members. The ETG Crips' primary drug shops were located in the Baltimore Hilton neighborhood (which the Baccwest ETG Crips considered to be their headquarters), the Lexington Terrace neighborhood, and the Franklin Sinclair neighborhood.

The ETG Crips used social media websites such as Instagram and YouTube to assert their claim to particular drug territories, intimidate rival gangs and witnesses against the gang, enhance the ETG Crips' status, and enhance individual members' status within the gang. Members of the ETG Crips posted photographs and rap videos to these social media websites in which they flaunted firearms and threatened to kill those who stood in the way of the gang.

The ETG Crips engaged in criminal activities in furtherance of the gang, including, but not limited to, acts involving murder, drug trafficking, assault, robbery, obstruction of justice, and witness intimidation and retaliation. By participating in criminal activities in furtherance of the gang, particularly violent acts directed by the ETG Crips leadership, ETG Crips members earned respect from fellow members and maintained or advanced their position within the gang.

The Defendant, Ridgley SHIPLEY, a/k/a "Crazy," was a member of the ETG Crips during the dates of the racketeering conspiracy charged in the Superseding Indictment. The Defendant agreed with members of the ETG Crips to conduct and participate in the gang's affairs through a pattern of racketeering activity that included conspiracy to distribute controlled substances (including heroin and crack cocaine), possession with intent to distribute controlled substances (including heroin and crack cocaine), and robbery.

In particular, on January 21, 2016, the Defendant advertised marijuana for sale on his Instagram account, writing: "dimes and half baby's, HMU [hit me up] b4 the storm."

On February 16, 2016, the Defendant posted photos to his Instagram account flaunting his Eight Tray Gangster Crips tattoos, including tattoos saying "Crip or Cry," "ETG," "83," and "War Never Ends."

On October 1, 2016, in a recorded telephone call, the Defendant and an unindicted co-conspirator discussed the need to "weed out" self-professed members of the ETG Crips whose goals were not truly aligned with the gang. The unindicted co-conspirator stressed that anyone

R S

who was "claiming Eight Tray Gangster that's not official, he either gonna move with us or he gonna get moved on." The Defendant agreed: "That's on the set."

On October 19, 2016, Co-Conspirator 1 told an unindicted co-conspirator that he was writing a book about the history of the ETG Crips in Baltimore, including "all sides blocks n ogz." Co-Conspirator 1 asked the unindicted co-conspirator for the "codes" that incarcerated members of the ETG Crips used behind bars. The unindicted co-conspirator said he would need to get them out of the papers in the Defendant's house.

On March 14, 2017, in a recorded telephone call, the Defendant complained to an unindicted co-conspirator that some members of the ETG Crips had not shown "loyalty" to him after he got locked up. The Defendant said when he got released from jail, he would be "right back on the front lines for the set, without a problem, no questions asked—even risking coming back in here for the set. That's how much I love it." Later in the call, the Defendant said that he had everyone in the jail wanting to be "Tray."

On May 12, 2017, in a recorded telephone call, Co-Conspirator 1 discussed ETG Crips business with an unindicted co-conspirator. Co-Conspirator 1 and the unindicted co-conspirator talked about how the Defendant had "campaigned" for the ETG Crips in jail and recruited new members. Co-Conspirator 1 and the unindicted co-conspirator discussed ways to distinguish between those who had been officially brought into the gang by someone like the Defendant, and those who were "fraudulent."

In or about May 2017, but prior to May 23, 2017, the Defendant told an unindicted co-conspirator that he had assaulted a fellow Crips member in the Maryland correctional facility where the Defendant was housed as a sanction for not following proper protocols. According to the Defendant, the victim of the assault was disrespecting another Crip in front of members of a rival gang, the Black Guerilla Family (BGF)—a violation of gang rules. The Defendant reported that the correctional officers on duty let him beat the victim for a period of time before intervening.

On May 24, 2017, in a recorded telephone call, Co-Conspirator 1 and an unindicted co-conspirator discussed an inmate whom the Defendant had recently recruited to join the ETG Crips. The unindicted co-conspirator told Co-Conspirator 1 that the new recruit had "a lot to prove" because he had "switched" from membership in a different gang. Co-Conspirator 1 agreed, saying that the Defendant should be running his new recruits up the chain of command. Co-Conspirator 1 added that once the new recruit was released from jail, he would need to "come on every last one of these missions" in order to prove himself.

On June 9, 2017, in a recorded telephone call, Co-Conspirator 1 and an unindicted co-conspirator discussed ETG Crips business. Co-Conspirator 1 said he was about to supply someone with ounces of marijuana. The unindicted co-conspirator told Co-Conspirator 1 that the Defendant wanted them to smuggle drugs into the jail for him.

In or about June 2017, an unindicted co-conspirator directed the Defendant to kill Victim 11 because Victim 11 had cooperated with law enforcement against members of the ETG Crips. In a handwritten letter recovered from the Defendant's jail cell on June 26, 2017, the unindicted

co-conspirator used coded language to inform the Defendant that Victim 11 had told correctional officers where the ETG Crips were storing weapons in the jail. The unindicted co-conspirator confirmed that the hit on Victim 11 was "official."

On June 26, 2017, within his jail cell at the Maryland Correctional Training Center, the Defendant possessed ETG Crips gang paperwork discussing the gang's history, structure, territories, oath, and colors, as well as certain "Tray Lingo."

On November 28, 2017, within 6806 Snowberry Court, Ridgley SHIPLEY possessed with intent to distribute marijuana, and possessed a .30 caliber rifle with serial number WW016 and Crips gang paperwork.

On February 25, 2019, Co-Conspirator 1 told Co-Conspirator 8 that Co-Conspirator 1 and the Defendant were attempting to consolidate leadership over all the ETG Crips in Baltimore. Co-Conspirator 1 wrote: "Trying put something together wit Crazy now we finding out who moving forward wit us an not." Co-Conspirator 1 explained that he and the Defendant were going to organize a party for the Nutty North Side ETG Crips and the Baccwest ETG Crips and "let nig\*\*s kno we dropping that side shit n all jus pushing ETG as it should be." Co-Conspirator 8 replied: "I'm with that 3000% just let me know when and where and I'll 8e there 3 I like how dat sound."

On April 21, 2019, in a recorded telephone call, Co-Conspirator 1 and Co-Conspirator 5 discussed ETG Crips business. Co-Conspirator 1 used coded language to tell Co-Conspirator 5 that he and the Defendant were planning to make "power moves" with respect to the ETG Crips on the Nutty North Side.

On June 14, 2019, Co-Conspirator 1 told the Defendant that Co-Conspirator 2 had a .45 caliber gun that the Defendant could borrow for the weekend. The Defendant said that would be acceptable.

On June 23, 2019, the Defendant and an unindicted co-conspirator robbed employees of the Jiffy Lube located at 950 Ritchie Highway in Arnold, Maryland. During and in relation to that robbery, the Defendant used, carried and brandished a loaded, stolen 9mm caliber Sig Sauer P365 semi-automatic handgun with serial number 66A275995. Jiffy Lube was a business that engaged in interstate commerce by automobile maintenance services. The robbery of the Jiffy Lube affected, interfered with, and obstructed interstate commerce because it interfered with the operations of the business following the robbery.

The Defendant agrees that he conspired with other members of the ETG Crips to distribute heroin and cocaine base in furtherance of the gang, and that it was reasonably foreseeable to him that 400 grams or more of heroin would be distributed by members of the conspiracy.

SO STIPULATED:

*Christina Hoffman*
Christina A. Hoffman

Rev. August 2018

Kim Y. Oldham
Assistant United States Attorneys

Ridgley Shipley
Defendant

John McKenna, Esq.
Counsel for Defendant